WEBBER and DUKE, Appellees, v. OLIVER HARTER and
ISABELLA HARTER, Appellants.

**Specific performance:** DISCRETION: FRAUD: EVIDENCE. Specific performance of a contract is in a large measure discretionary with the court and will be refused whenever its enforcement would result inequitably; but where the contract is not unfairly procured, or unfair in its terms, its enforcement will not be refused because one of the parties has become tired of his bargain and prefers not to carry it out. In the instant case the evidence is insufficient to show that one of the parties to a contract of ex-

change of lands wrongfully concealed the existence of a railroad across his land, or that defendant was in fact deceived.

**Sale of real property:** DEFICIENCY IN ACREAGE: PRESUMPTION. A deficiency of about two acres in a farm described as containing two hundred acres more or less is not such a deficiency as to raise the presumption that if known the sale would not have been made.

*Appeal from Davis District Court.*—HON. D. M. ANDERSON Judge.

WEDNESDAY, MARCH 6, 1912.

ACTION in equity to enforce specific performance of a written contract for the sale or exchange of lands. There was a decree as prayed, and defendants appeal.—*Affirmed.*

*Steck, Daugherty & Steck,* for appellants.

*C. W. Whitmore, F. G. Orelup,* and *J. F. Webber,* for appellees.

WEAVER, J.—On June 11, 1908, the plaintiffs, owning certain lands in Davis and Appanoose counties, and the defendants, owning other land in Mahaska county, entered into a written contract for the exchange of said properties substantially as follows: Plaintiffs undertook, for an expressed consideration of $16,000, to convey to Harter a tract described as being all that part of "a two hundred and eighty-acre farm" situated in section 18, twp. 68, range 15, in Davis county, and in section 13, township 68, range 16, in Appanoose county, "being all that part of said farm of two hundred and eighty acres which lies about two miles east of Moulton, Iowa, which is north of the public highway which runs east and west through said land, which part contains two hundred acres, more or less, according to government survey." In payment or exchange for this land, defendants undertook to convey to plaintiff

their farm of one hundred and twenty acres in Mahaska county at a valuation of .$15,000; payment of the difference, $1,000, to be secured by mortgage.

The deeds, pursuant to this contract, were to be delivered on February 18, 1909, and possession of lands delivered on March 1st following. Other stipulations were made; but their statement is not at present material. No money was paid or received. Soon after the contract was executed, the defendants, making the claim that the land proposed to be conveyed to them had been misrepresented by the plaintiffs, and that the same was incumbered by a railroad right of way, which had not been disclosed to them, notified plaintiffs they would not carry out the contract. On the date provided therefor in the contract, plaintiffs tendered defendants a conveyance and demanded fulfillment of the agreement on part of the latter, and, this being refused, the present action was begun for its specific enforcement. As already noted, the court found for the plaintiffs, granted the relief prayed, and defendants appeal.

The dispute of fact between the parties is a narrow one. The evidence tends to show that at the opening of negotiations, through agents and brokers, the defendants had never seen plaintiff's farm, and were unacquainted with its character and condition, except as stated by plaintiffs or their agents. It was finally arranged that defendants should go to Mahaska county and see the place for themselves. Accompanied by one of the plaintiffs and an agent, they went by railroad to the station nearest the land, and there, taking a carriage, drove to the house and farm buildings, which were on the south side of the tract, and thence in a northerly direction for some distance over the premises. The defendant, Oliver L. Harter, then left the carriage, and with another member of the party walked farther to the north, but how nearly they approached the boundary on that side is a matter of some dispute; but it is reasonably clear that they went far enough to obtain a

general view of the premises in that direction. At least, there is no contention that plaintiffs made use of any trick or device to divert Harter's attention, or to prevent or limit his investigation in that direction. Having gone as far north as he cared to go, defendant changed his course to the east, and finally to the south, returning to the carriage. This trip was made on June 1, 1908, and it was not until ten days later that the written agreement was executed. Thus far there is very little controversy between the witnesses. We come now to matters upon which they divide. To get the force of the defendant's complaint, it is necessary that we speak more particularly of the actual description of the land plaintiffs were proposing to exchange. The two hundred and eighty acres comprising the entire farm is shown by the accompanying diagram A.

The farm included all of the seven forty-acre subdivisions indicated upon the plat, less the railroad right of way and the triangle north of the railroad, containing about two and three-fourths acres. They also owned the

smaller triangle of about nine-sixteenths of an acre lying south of the railroad in the forty lying immediately north of the S. E. ¼ of the N. E. ¼, 13.

By reference to the contract, it will be seen that the part of the farm lying north of the public road, which is the only part involved in this litigation, consists of five of said forty's or quarter-quarter sections, minus the part cut from the northwest corner by the railroad right of way, and plus the smaller part added thereto south of the railroad. Assuming that these subdivisions are of full dimensions according to the standard of the government survey, the tract would contain two hundred acres, less the amount cut off by the railroad, or substantially one hundred and ninety-eight acres.

It is testified by defendants and admitted on the trial that before presonally inspecting the land defendants inquired as to the shape or outline of the tract, and one of the plaintiffs thereupon drew a diagram to illustrate it. That figure was put in evidence as Exhibit V, and is here reproduced.

It will be seen that the diagram fails to note the existence of the railroad, and it is also conceded that nothing was said about the existence of the railroad. The irregular

diagonal line on the plat represents a swale or slough, which lies across the land. This representation, the defendants allege, was relied upon by them in making the contract. Plaintiffs, while admitting the making of the sketch, say it was intended solely to illustrate the general outline of the farm, without any reference to minor details, and without any purpose to deceive. Moreover, they say that as the party approached Moulton on the train before the visit to the farm, and while passing the northern boundary of the land in controversy, they called defendants' attention to the farm and crops which were growing thereon immediately adjacent to the right of way in such manner that they must have seen and appreciated the position of the farm with reference to the railway. In this the witness is corroborated by the agent; but the story is denied by the defendants.

Defendants further say that while on the farm they drove to a point near the common corner of the west four of the forty-acre tracts, and there, in reply to a question by defendants, plaintiff said these tracts constituted a "square" quarter section. This, too, is denied, and there is corroboration on both sides. Defendants swear they had no knowledge of the existence of the railroad upon the land, and would not have entered into the contract, had they known the truth about it. They also offer the testimony of several witnesses, who testify that the existence of a railroad on a farm, as here shown, is a source of inconvenience and annoyance to the landowner. Other witnesses on part of plaintiff give it as their opinion that the railroad does not injuriously affect the value or use of the farm.

Further recitation of the testimony is unnecessary. The general rules governing equitable actions for specific performance of contracts have been quite thoroughly discussed in behalf of both appellants and appellees. Upon abstract propositions, there is little difference in their posi-

tions, but, as is usually the case, the divergence of opinion arises upon their application to the facts.

I.    It is undoubtedly true, as counsel for appellants say, that specific performance rests in great measure in the discretion of the court, and that such relief will be refused wherever enforcement would effectuate in-

1. SPECIFIC PER-
FORMANCE:
discretion:
fraud:
evidence.

equitable results. A court of equity will not wilfully lend its sanction to craft, fraud, or oppression; but where the contract is not unfairly procured nor unfair in its terms, the court will not arbitrarily refuse to enforce it for no better reason than that one of the parties has repented his bargain and prefers not to carry it out. A careful reading of the testimony leads us to conclude that it discloses no purpose on part of the plaintiffs to mislead or deceive the defendants with reference to the existence of the railroad upon one corner of the land. The only evidence on which a contrary finding could be based is to be found in the furnishing of the plat or diagram last above shown, and the conversation which defendants allege took place as the party visiting the farm was standing at the common corner of the four west forties. Related in the language of the defendant O. L. Harter, that conservation was as follows: "When we were going over the land we came to a place where Webber says, 'Here is where the four forties corner.' I said, 'This is a square 160?' and he says, 'Yes.' There was nothing said about the three-cornered piece nor about the railroad at that time. There was no reference made by either Mr. Webber or Mr. Akerman to the railroad at any time."

These are the circumstances upon which defendants claim to have relied, and that in such reliance they entered into the contract without having seen the railroad on the premises, or known of its existence there. At the time the plat was made there was, so far as appears, no thought on part of either party of making an exchange without personal inspection of plaintiffs' farm by the de-

fendants, and it seems hardly credible that the failure to
mark the railroad on the plat or to mention it in conversa-
tion was induced by any purpose to deceive the plaintiff
concerning a physical fact, so patent and unconcealable
that it could scarcely fail to attract the notice of anyone
who should examine the premises, and this fact, aided by
the presumption of good faith which attaches to ordinary
business transactions leads us to believe that the plat was
drawn and furnished with no fraudulent purpose. But
even in the absence of fraudulent intent, had defendants
relied thereon and made the exchange without personal in-
spection of the property, we should be inclined to say that
specific performance should be denied, and the decree be-
low reversed. Coming, however, to the visit which was
made to the farm, we think it must also be said that the
conversation which defendants say took place there has a
somewhat forced and unnatural sound. If defendants sup-
posed they were being offered four full forties according
to government survey, and having a common corner at the
point where the party stood, they knew that a tract so
composed constituted "a square 160," and there would
seem to be nothing in the situation to prompt such an in-
quiry. Again, the party had then arrived at a point within
eighty rods or less of the railroad, and plaintiffs did not
know how far or how minutely defendants would press
their further examination of the premises. To make a
false statement of a matter so liable to be exposed within
the next few minutes would hardly comport with the
shrewdness or cunning of men engaged in an elaborate
scheme of fraud. Moreover, the defendant, O. L. Harter,
did, immediately thereafter, leave the carriage in which
they were driving, and walked some distance farther north
in the direction of the railroad, and, as we have already
mentioned, nothing was done to hinder or prevent his go-
ing to the boundary. From the testimony as to this walk
and the general topography of the farm, it appears rea-

sonably clear that the existence and location of the railroad must have been plainly visible to the defendant. Considering all these circumstances, and remembering that the burden is upon the defendants to show facts excusing them from the performance of their written contract, we conclude with the trial court that such burden has not been overcome.

We are not disposed to give much weight to plaintiffs' claim that, even if the charge of fraud and deception be true, defendants should have discovered it and kept out of the trap set for their feet, and if the plaintiffs' case rested upon no surer foundation we should have no hesitation in denying them specific performance. The doctrine is as incompatible with sound equity as with good morals; but the difficulty with the defense in this case is in its failure to make good, by a fair preponderance of the evidence, the claim that they were in fact deceived. The discrepancy in acreage is not so large as to raise any presumption, or suspicion even, that they did not know just what they were getting in the exchange. It is difficult to believe that, having made the trip for the express purpose of examining a farm they had never seen, having gone upon the premises and driven and walked over them to such an extent that they felt satisfied to make the exchange, they were still in ignorance of the patent and unconcealable fact of the existence of the railroad there.

The fact that the contract describes the land as containing two hundred acres, more or less, according to government survey, is not of the great significance which appellants attach to it. The "more or less"

2. SALE OF REAL PROPERTY: deficiency in acreage: presumption.

clause is designed to avoid a repudiation of the contract because of comparatively small discrepancies in measurements and estimates, and this difference is not so large that we can presume it would have prevented the exchange, had it been known. It may further be said there is nothing in the record to

show with any certainty that defendants will not, by the conveyance tendered them, obtain a full two hundred acres of land. In short, we find no such want of equity in the contract as will justify the court in refusing to enforce it, and the decree below is therefore *affirmed*.